UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| OMAR S. MONTOYA, | : | |
| Plaintiff, | : | CASE NO. 3:17-CV-01541-MPS |
| | : | |
| v. | : | |
| | : | |
| FEDERAL BUREAU OF INVESTIGATION, | : | |
| *et al.*, | : | |
| Defendants. | : | February 26, 2020 |

**SUMMARY JUDGMENT RULING**

Plaintiff Omar Montoya ("Montoya") filed this action against the Federal Bureau of

Investigation ("FBI"), the U.S. Department of Justice ("DOJ"), U.S. Attorney General Jefferson

Sessions ("Sessions"), and FBI Director Christopher Wray ("Wray") (collectively, the

"Defendants") alleging that he was retaliated against and subjected to a hostile work

environment because of his participation in civil rights activities under Title VII, 42 U.S.C.

§2000e *et seq.* He seeks declaratory and injunctive relief, including a promotion, back pay and

retroactive benefits and seniority, compensatory damages for emotional distress, and costs and

fees. *See* Am. Compl., ECF No. 34.

The Defendants moved for summary judgment on all counts. ECF No. 45. For the

reasons set forth below, the motion is denied as to both counts.

I.      **FACTS**

The following facts are taken primarily from the parties Local Rule 56(a) Statements and

the documents cited therein. *See* Defs.' L.R. 56(a)(1) Stmt. ("Def. Stmt."), ECF No. 45-2; Pl.'s

L.R. 56(a)(2) Stmt. ("Pl. Stmt."), ECF Nos. 54-2 & 54-3 (responses and additional material facts,

respectively). The facts are undisputed unless otherwise stated.

## A. Employment History with the FBI

Montoya began working for the FBI in October 2010, as an Electronics Technician ("ET") for the New Haven Division ("NHD"). Pl. Stmt., ECF No. 54-2 ¶ 1. He started at the "GS-7" level on the General Schedule pay scale for federal employees, *id.*, and was promoted to GS-9 in October 2011, to GS-10 in August 2013, and to GS-11 in September 2014. Pl. Stmt., ECF No. 54-3 ¶ 1; Pl. Ex. 3, ECF No. 54-1 at 23. Montoya received positive job performance evaluations in 2012, 2013, 2014, and 2015. Pl. Ex. 4, ECF No. 54-1 at 27 ("successful" rating in 2012); Pl. Ex. 5, ECF No. 54-1 at 32 ("excellent" rating in 2013); Pl. Ex. 6, ECF No. 54-1 at 38 ("excellent" rating in 2014); Pl. Ex. 7, ECF No. 54-1 at 44 ("excellent" rating in 2015). During that period, Montoya's direct supervisor was Telecommunications Manager Mark DeWolfe. Defs. Mem., ECF No. 46 at 5 (citing Am. Compl.). His second-level supervisor was Supervisory Special Agent Todd Kalish. *Id.* The NHD field office was run by Special Agent in Charge Patricia Ferrick, followed by Assistant Special Agents in Charge Kevin Kline and Daniel O'Brien. *Id.* at 5–6. The ET program was overseen by a Program Manager at FBI Headquarters, Dallas McWilliams. *Id.* at 6.

## B. EEO Counseling

In addition to his ET role, Montoya also volunteered as an EEO counselor for the FBI starting in 2012. Montoya Dep., ECF No. 47-2 at 7-8. In 2015, he acted as the EEO counselor for Special Agent Kurt Suizdak regarding complaints of retaliation Suizdak made against Kline. Pl. Stmt., ECF No. 54-2 ¶¶ 4–5. Montoya, in his capacity as EEO counselor, met with Kline on February 4, 2015 to discuss Suizdak's complaint. Pl. Stmt., ECF No. 54-2 ¶ 6. The Defendants aver that this February 4 meeting "was the only time Montoya met with Kline regarding Suizdak's EEO complaints," *id.* ¶ 7, but Montoya claims he met with both Kline and Ferrick in

April 2015 regarding another complaint by Suizdak, Montoya Aff., ECF No. 54-1 at 4–5; *see also* Suizdak Aff., ECF No. 54-1 at 53–54 (averring that he filed complaints in both February and April 2015, and that he met with Montoya on April 27, 2015 to "allow[] Montoya to meet with SAC Ferrick and ASAC Kline in connection with my complaints of retaliation").

At one of these meetings with Montoya regarding Suizdak's complaints,[1] Kline "became upset" and "said that Suizdak was lazy and did not belong in the FBI." Pl. Stmt., ECF No. 54-2 ¶ 8. Montoya further avers that Kline "got very angry" and "slammed his hand on the desk" at the meeting, giving Montoya the impression that he was upset at Montoya for "questioning him, executive management." Montoya Dep., ECF No. 54-1 at 64–65. Suizdak also asserts that, in May 2015, "Kalish advised me not to use Montoya for any EEO complaints." Suizdak Aff., ECF No. 54-1 at 54.[2]

From 2012 until 2016, Montoya's wife, Geanabelle Montoya, also worked for the NHD of the FBI and was supervised by Office Services Supervisor Lisa Adamcewicz. Pl. Stmt., ECF

---

[1] The Defendants admit that Kline became upset at the February 2015 meeting, which they claim was the only meeting between Montoya and Kline regarding Suizdak. *See* Defs. Mem., ECF No. 46 at 8 n.2 (arguing that Montoya met with only Ferrick in April 2015 regarding a second Suizdak complaint). Montoya claims he met with Kline in February 2015, and then with both Kline and Ferrick in April 2015. Montoya Aff., ECF No. 54-1 at 4–5; Montoya Dep., ECF No. 54-1 at 64 (testifying that he met with Kline in "April or May of 2015," at which meeting Kline was very upset and slammed his hand on the desk).

At his deposition, Montoya was asked, "Was it only one meeting that you had with [Kline] regarding Agent Suizdak's EEO complaints or were there multiple meetings?", to which Montoya responded, "There was only one." Montoya Dep., ECF No. 54-1 at 64. In his opposition brief, Montoya argues that "he understood the question to be specifically directed to his work on Suizdak's second EEO complaint and not the work he performed on Suizdak's earlier EEO complaint." Opp'n, ECF No. 54 at 30 n.5.

[2] The Defendants argue that this portion of Suizdak's affidavit is "inadmissible hearsay." Reply, ECF No. 55 at 6 n.5. Assuming that Suizdak would testify at trial, his testimony regarding Kalish's statements would likely be admissible as an admission by a party-opponent. *See* Fed. R. Evid. 801(d)(2)(D).

No. 54-2 ¶ 9. In his opposition papers, Montoya submitted evidence that Geanabelle Montoya was reassigned to a different squad in June 2015, at Kline's direction. Geanabelle Montoya Aff., ECF No. 54-1 at 119 (stating, "In or about early 2015, I was instructed by my FBI Squad 3 supervisor to maintain a file on Suizdak . . . . I was told by my Squad 3 supervisor[] that it was Kline who had instructed that this file be kept," and "In or about June 2015, OSS Adamcewicz removed me from my position and reassigned me from Squad 3 without reason or explanation"); Westerbeke Aff., ECF No. 54-1 at 387 ("In or about June 2015, ASAC Kevin Kline directed that Geanabelle Montoya be removed from Squad 3.").

### C. July 2015 Email

"On or about July 1, 2015, Adamcewicz asked DeWolfe if [Omar] Montoya was scheduled to work [a] command post." Pl. Stmt., ECF No. 54-2 ¶ 11. On July 1, Montoya sent an email to Adamcewicz and eight other individuals, including DeWolfe, Kalish, Kline, O'Brien, and Ferrick. *Id.* ¶ 12. In the email, he told Adamcewicz that he "was told the reason you were asking about my work schedule was to see if one of your employee[s] was being truthful about her whereabouts this weekend. First of all, I don't work for you so you have absolutely no business inquiring about my work schedule." *Id.* ¶ 13; Pl. Ex. 14, ECF No. 54-1 at 121. He also addressed part of the email to "executive management," stating that he found Adamcewicz's conduct to be "malicious" and "unprofessional," and "suggest[ing] this incident be taken serious for the well being of not just me and [Geanabelle Montoya] but for all of [Adamcewicz's] employees. It is my hope that a corrective action be taken on this matter." Pl. Stmt., ECF No. 54-2 ¶ 14; Pl. Ex. 14, ECF No. 54-1 at 121.

On July 7, 2015, Kalish called Montoya to discuss Montoya's July 1 email. Pl. Stmt., ECF No. 54-2 ¶ 16. The Defendants aver that Kalish, at Kline's direction, "told [Montoya] he

needs to use his chain of command and not send blanket emails to all of executive management every time a decision is made that he does not agree with." *Id.*; Def. Ex. 22, ECF No. 49-2 at 2 (notes from 7/7/2015 summarizing phone call with Montoya, noting, "I suggested OM take some time to reconsider his decision as it could be considered insubordinate and the penalties for such behavior [were] harsh"); Kalish Dep., ECF No. 47-7 at 4–6 (testifying that Kline "didn't want e-mail bombs being sent out," and that he "relayed what ASAC Kline had said" to Montoya); Defs. Ex. 23, ECF No. 49-3 at 2 (email from Kalish to Kline, summarizing phone call with Montoya and stating, "It didn't go well"). Montoya recalls that Kalish "reprimanded" him and "said [he] could be terminated for being insubordinate if [he] continued to contact the SAC concerning [his] complaints." Montoya Aff., ECF No. 54-1 at 5; Pl. Ex. 15, ECF No. 54-1 at 123–24 (email from Montoya to Kalish summarizing call, alleging that Kalish stated "You can get fired," "I'm giving you an order to stop emailing the front office," and "Kevin asked me to tell you to knock it off," and writing, "You are only interested in closing ranks with your fellow supervisors regardless of any wrongdoing by them against your own people").

### D. Promotion to GS-12

On September 10, 2015, DeWolfe sent an email to Kalish regarding Montoya's readiness for a promotion:

> I had a long discussion with Dallas [McWilliams] at the ET program yesterday and forwarded him the Montoya Email. He concurred that Omar should not be promoted to a GS12 until sufficient time had passed and that he could demonstrate both better self control and professionalism.
>
> Dallas also reminded me that this was the second time Omar had used this bulk email distribution as a method to garner support. He cited the failing data class [sic] Omar took.
>
> We will need to take a few minutes of Kevin [Kline]'s time to discuss this but there is no urgency.

Pl. Ex. 16, ECF No. 54-1 at 126. At Montoya's annual performance appraisal with DeWolfe on October 29, 2015, Montoya requested a promotion to the GS-12 level, and he and DeWolfe "discussed promotion potential," and DeWolfe "recommended that he take on complete oversight of a larger project in order to demonstrate proficiency." Pl. Stmt., ECF No. 54-2 ¶ 17; Defs. Ex. 25, ECF No. 49-5 at 2 (notes for "10/29/2015[:] ET Montoya is provided with his yearly PAR . . . . Promotion is discussed and TM DeWolfe recommends complete oversight of VSF project . . . . This project would be a strong indicator of proficiency"); Montoya Aff., ECF No. 54-1 at 5–6 ("I requested a promotion to a level GS-12 ET. . . . DeWolfe assigned me the Visitor Screening Center Project . . . . De[W]olfe also said that the successful completion of the VSF project would be a strong indicator of promotion for me.").

"In March 2016, after the project was complete, Montoya again approached DeWolfe about promotion to a GS-12." Pl. Stmt., ECF No. 54-2 ¶ 19. Montoya avers that DeWolfe told him on March 23, 2016 "that he had submitted a recommendation that [he] be promoted" and that "the promotion request was in McWilliams' hands now and I should expect the promotion to come through within two (2) pay periods [i.e., approximately four(4) weeks]." Montoya Aff., ECF No. 54-1 at 6. On March 23, 2016, DeWolfe emailed Dallas McWilliams—the ET Program Manager at FBI Headquarters—and recommended Montoya for promotion to GS-12. Pl. Stmt., ECF No. 54-2 ¶ 20; Defs. Ex. 26, ECF No. 49-6 at 3 ("During the past 15 months as a GS-11 Montoya has taken on a host of responsibilities . . . . [and] has maintained a positive attitude and continues to work to increase his knowledge base of new and emerging technologies."). McWilliams asked DeWolfe to "submit the pertinent information on a FD-1122" form. Defs. Ex. 26, ECF No. 49-6 at 2.

On April 21, 2016, DeWolfe sent a version of the FD-1122 to Kalish and Cynthia Westerbeke, an Administrative Officer in the New Haven Division, asking for their input and "concurrence." Pl. Ex. 25, ECF No. 54-1 at 199. Westerbeke avers that "[w]ithin a few days of receiving the email, possibly the same day, . . . Kalish remarked to me he was still not over the fact Montoya had written an email the previous year criticizing Kalish stating he was going to 'unmask his poor leadership.'" Westerbeke Aff., ECF No. 54-1 at 208.

Also on April 21, 2016, "without first following up with DeWolfe," Montoya sent an email to McWilliams "to inquire about the status of his promotion." Pl. Stmt., ECF No. 54-2 ¶ 22; Def. Ex. 27, ECF No. 49-7 at 2. On April 26, 2016 at 12:12 PM, DeWolfe submitted the FD-1122 form to McWilliams, stating that Montoya "is regularly performing at the GS12 level" and asking for McWilliams's review and input. Defs. Ex. 30, ECF No. 49-10 at 2. At 12:35 PM on April 26, McWilliams responded and expressed his "concurrence to promote ET Montoya to GS-12." Defs. Ex. 31, ECF No. 49-11 at 2. After that 12:35 PM email, McWilliams "called DeWolfe and informed him that the written narrative on the final page of the FD-1122 had insufficient detail to support DeWolfe's assessment of Montoya's proficiencies." Pl. Stmt., ECF No. 54-2 ¶ 26; *see also* McWilliams Dep., ECF No. 48-6 at 19–20 (testifying that he sent the initial email "after a cursory look," but upon further review he found the "information was insufficient" and "attempted to recall that e-mail"). McWilliams asked DeWolfe to review the form again and provide additional information. Pl. Stmt., ECF No. 54-2 ¶¶ 28–29.

On April 28, 2016, DeWolfe met with Montoya for his mid-year performance review. *Id.* ¶ 32. Montoya alleges that DeWolfe "told [him] that Kline, Kalish and McWilliams had denied my promotion to GS-12 ET," that "Kalish and Kline were 'still pissed off' at me about the e-mail I had sent in July 2015," and "that it was out of his hands and there was nothing he could do

about the denial of my promotion." Montoya Aff., ECF No. 54-1 at 6. DeWolfe testified that they discussed "concerns about [Montoya's] performance," including an "ICANT e-mail" and "his lack of interest in using the SharePoint website." DeWolfe Dep., ECF No. 54-1 at 138–39.

At 8:19 PM on April 28, Montoya emailed McWilliams to express his disagreement with the promotion decision and to ask "what the formal protocol is to dispute it." Defs. Ex. 33, ECF No. 49-13 at 3. Montoya wrote that DeWolfe "stated that you [McWilliams], along with SSA Kalish and ASAC Kline denied the promotion." *Id.* McWilliams forwarded the email to DeWolfe, who forwarded the email to Kalish, who forwarded the email to Kline. *Id.* at 2–3. Kline responded, "Don't remember denying this, but we will need to ensure the reasons why and the path forward," to which Kalish wrote, "We didn't deny it. Dallas did after talking to Mark. I think Omar links us to the denial because we didn't disagree with it." *Id.* at 2.

On May 2, 2016, DeWolfe submitted a revised FD-1122 form to McWilliams, opining that Montoya "is lacking growth in some of the critical areas needed for promotion," and stating that he "ha[d] discussed this at great length with my supervisor SSA Todd Kalish and he is in full concurrence with my decision and has briefed our ASAC [Kline] citing specific examples." Def. Ex. 34, ECF No. 49-14 at 2. Montoya met with Kalish that same day "to discuss the denial of his promotion." Pl. Stmt., ECF No. 54-2 ¶ 36. The Defendants claim that Kalish told Montoya "he fell short of the GS-12 proficiencies in some aspects." Pl. Stmt., ECF No. 54-2 ¶ 38; Defs. Ex. 22, ECF No. 49-2 at 2–3 (notes from 5/2/16 summarizing meeting, stating "On the decision making element, I highlighted some acts of pushback, arguably insubordinate pushback, on his part to the TM [DeWolfe], SSA [Kalish] and ASAC [Kline]. I informed him I needed confidence . . . he would be able to . . . follow the direction of the front office and SSA [Kalish]"). Montoya alleges that Kalish also told him he was not promoted because "you need to learn how to use

your chain of command." Montoya Aff., ECF No. 54-1 at 7. He also alleges that neither DeWolfe nor Kalish provided him with "an explanation of the technical ET skills I supposedly lacked; nor did they provide me with any 'plan' to allow me to obtain these skills." *Id.*

On May 3, 2016, Montoya had another meeting with Kline and Kalish. Pl. Stmt., ECF No. 54-2 ¶ 43. Montoya brought another agent with him to the meeting to serve as a witness, and "Kline was upset that Montoya brought a witness . . . and told the agent that his presence was not required." *Id.* ¶ 45; Defs. Ex. 22, ECF No. 49-2 at 3 (notes from 5/3/2016 summarizing meeting, noting "ASAC Kline did not allow OM to have a third party attend the meeting as ET Montoya asked for the meeting with him. ASAC Kline asked OM to have a seat approximately six times before OM complied and had a seat. ASAC Kline was clearly unhappy with OM and made his thoughts on the matter clear."). The Defendants claim that after "Kline was calm," "they had a productive discussion about his promotion." Pl. Stmt., ECF No. 54-2 ¶ 47. Montoya disagrees, claiming that,

> Kline directed [the other agent] to leave the meeting and then shouted at me, accusing me of being disrespectful . . . . Kline shouted at me several times to sit down. I was taken aback by Kline's behavior and asked for permission to leave the meeting and suggested that we continue the meeting at a later time. Kline, however, persisted in yelling at me and ordered me to sit down. After Kline calmed down, he told me that he did not know anything about the denial of my promotion, but that he would look into it.

Montoya Aff., ECF No. 54-1 at 7. Kline testified that, following the May 3 meeting, he gathered information on the ET promotion criteria and on Montoya's job performance and "attempted to perform an independent comparison of the promotion requirements against Montoya's documented performance." Pl. Stmt., ECF No. 54-2 ¶ 49. Montoya claims that after the May 3, 2016 meeting, Kline "never contacted [him] again about my promotion." Montoya Aff., ECF No. 54-1 at 16.

On May 10, 2016, Montoya requested a meeting with Ferrick because he had not yet received any response from Kline, and they had a meeting that same day. Pl. Stmt., ECF No. 54-2 ¶¶ 50–51. Ferrick testified that Montoya told her, at the May 10 meeting, that "he was upset about the promotion that he didn't get" and that "he was concerned that it may have something to do with retaliation for being an EEO counselor." Ferrick Dep., ECF No. 54-1 at 163. Montoya stated at his deposition that, as of May 2016, he "believed that [he had] been denied a promotion . . . because of the July 2015 email . . . [a]nd events that happened after," that he "communicated that to SAC Ferrick," and that Ferrick responded saying, "what can I do to stop the EEO complaint." Montoya Dep., ECF No. 47-2 at 60.

### E. Temporary Duty Assignment Request

On May 18, 2016, Montoya requested "approval for a two-week detail to FBI headquarters." Pl. Stmt., ECF No. 54-2 ¶ 53. Montoya avers that both DeWolfe and FBI headquarters approved the assignment. Montoya Aff., ECF No. 54-1 at 8. However, Kline denied the request. Pl. Stmt., ECF No. 54-2 ¶ 54. In his sworn statement provided in connection with the EEO investigation, Kline wrote that he denied the request "based upon [Montoya's] performance and our previously discussed plan by which ET Montoya could better perform his assigned duties at the New Haven Division." Pl. Ex. 37, ECF No. 54-1 at 286. At his deposition, Kline testified that he was also concerned about "a workload issue with the ETs in the division." Kline Dep., ECF No. 47-10 at 19.

### F. EEO Complaint

On May 19, 2016, Montoya "initiated contact with [an] EEO counselor, the first step in filing an EEO complaint." Pl. Stmt., ECF No. 54-2 ¶ 56. The EEO counselor met with Montoya, McWilliams, and DeWolfe regarding Montoya's concerns. Pl. Ex. 38, ECF No. 54-1 at 294–95

(FBI EEO Counselor Program Report of Counseling). At his meeting with the EEO counselor, DeWolfe "mentioned that Mr. Montoya's complaint is not an EEO issue if he failed to meet the criteria and that he is disappointed that Mr. Montoya chose to file an EEO complaint." Pl. Ex. 38, ECF No. 54-1 at 295.

On June 10, 2016, Montoya met with Ferrick, and Ferrick "suggested that she get him and DeWolfe together to 'take your gloves off' and work things out." Pl. Stmt., ECF No. 54-2 ¶¶ 62–63. They scheduled a meeting for June 14, but the meeting did not take place as scheduled because DeWolfe was not available. *Id.* ¶¶ 64–65. Montoya filed a formal EEO complaint on June 14. *Id.* ¶ 66.

### G. Sick Leave, May-July 2016

On May 23, 2016—four days after initiating contact with the EEO counselor—Montoya left work on sick leave. Pl. Stmt., ECF No. 54-2 ¶ 57. He went to the doctor "complaining of symptoms associated with high blood pressure, which he attributed to stress and anxiety, and was referred to a psychologist. *Id.* ¶ 58. On May 24, he filed a workers' compensation claim. *Id.* ¶ 59; Montoya Aff., ECF No. 54-1 at 15. He alleges that he was "told by a Department of Labor Representative that [he] did not have to report the nature of [his] work place injury to [his] supervisors." Montoya Aff., ECF No. 54-1 at 15.

Montoya's doctor "kept [him] out of work for one week," and he returned on May 31, 2016. *Id.* at 14; Pl. Ex. 65, ECF No. 54-1 at 415. Between May 31 and July 27, Montoya took 5 days of sick leave (June 3, June 14, June 24, June 28, and July 6) and 4 days of annual leave (June 17, June 22, July 5, and July 22). Pl. Ex. 65, ECF No. 54-1 at 415; Montoya Aff., ECF No. 54-1 at 14. He avers that he "communicated with DeWolfe about all of [his] sick days." Montoya Aff., ECF No. 54-1 at 14.

### H. Parking

Montoya alleges that on June 30, 2016, an FBI security guard told him that Chief Security Officer Harris "had asked him to keep an eye on the vehicle that [Montoya] was dr[i]v[ing] to work in the morning." Montoya Aff., ECF No. 54-1 at 15. On July 7, Harris asked Montoya to come to his office for a meeting. Pl. Stmt., ECF No. 54-2 ¶ 73; Montoya Aff., ECF No. 54-1 at 16 ("Harris ordered me to report to his office for a meeting, but he would not tell me what the meeting was about. . . . I was reluctant to meet with Harris, fearing I would be wrongfully accused of the misuse of a FBI vehicle."); Defs. Ex. 44, ECF No. 50-4 at 1–3 (email chain between Harris, Montoya, and Ferrick, in which Montoya explains he is reluctant to meet with Harris because he fears he is "being targeted by [his] supervisor and now the CSO based on [his EEO] complaint").

Montoya did not meet with Harris on July 7, but met with Ferrick on July 11, telling her that he "feared that Harris was tracking [his] use of [his] FBI vehicle with the intention of falsely accusing [him] of misusing the vehicle." Montoya Aff., ECF No. 54-1 at 16. Montoya then met with Harris, who "wanted to speak to him about his wife's car being parked in a secure FBI parking lot." Pl. Stmt., ECF No. 54-2 ¶ 75. Montoya admits that he "had, at times when his wife no longer worked at the FBI, parked both his car and his wife's car in the FBI parking lot," *id.* ¶ 76, but claims that he was not aware that was not permitted and that he "never parked two cars in the FBI parking lot again after [July 2016]," Montoya Aff., ECF No. 54-1 at 17.

### I. Negative Counseling

On July 27, 2016, Montoya met with DeWolfe regarding his performance, and DeWolfe told him his work had been "minimally successful in two of the performance elements in

Montoya's performance work plan." Pl. Stmt., ECF No. 54-2 ¶ 77. Specifically, DeWolfe cited

the following concerns:

- In June 2016, Montoya accidentally was "locked in at an antenna tower cite and called 911 for assistance," causing the Connecticut State Police to respond. *Id.* ¶ 78; Montoya Aff., ECF No. 54-1 at 9.

- "On one occasion when Montoya was sent to perform a routine check on equipment . . . , issues with the routine check resulted in equipment being taken offline the entire day. . . . It did not become operational again until Montoya obtained assistance from a lower-grade ET." Pl. Stmt., ECF No. 54-2 ¶ 79. Montoya states that the "analyzer" he was using for the maintenance had "malfunctioned," so he "called a lower grade ET working at a nearby site, who had a working 'analyzer,' for help." Montoya Aff., ECF No. 54-1 at 10.

- Defendants allege that Montoya "exceeded the approval amount he had been permitted to charge to his government credit card for materials." Pl. Stmt., ECF No. 54-2 ¶ 80. Montoya contends that he "obtained permission from [DeWolfe]" over the phone to spend more than he was originally authorized to. Montoya Aff., ECF No. 54-1 at 16.

- They discussed Montoya's use of leave time. Pl. Stmt., ECF No. 54-2 ¶ 81. Montoya alleges that "DeWolfe accused [him] of abusing sick leave," and that "DeWolfe also told [him] that from now on [he] had to provide a doctor note for any sick leave that [he] took" and "that [he] was no longer permitted to use 'flex-time'" and "was to adhere to a strict schedule of 8:15 a.m. to 5:00 p.m." Montoya Aff., ECF No. 54-1 at 11. Montoya alleges that DeWolfe told him these conditions applied only to Montoya, not to other ETs, because Montoya "was the only one on the 'radar' right now." *Id.* "Shortly after" their meeting on July 27, however, Kalish sent an email to all ETs instituting very similar rules regarding sick leave and flex time. Defs. Ex. 50, ECF No. 50-10 at 2 (requiring annual and sick leave to be approved in advance, requiring a doctor's note for sick leave taken on a Monday or Friday, instituting standard hours of 8:15 am to 5:00 pm, and requiring flex time to be approved in advance).

- Montoya alleges that DeWolfe "admonish[ed]" him for "stopp[ing] on I-95 during the work day to help save the victims of a car accident." Montoya Aff., ECF No. 54-1 at 9.

- Montoya also avers that DeWolfe "counseled [him] for a comment [he] made in January 2016 about the implementation of the Sharepoint site." *Id.* at 10. Montoya admits that he "said words to the effect that DeWolfe should grow some balls and tell Kalish that he would not implement the site for ET work." *Id.* He contends that he "made the comment in jest" and that DeWolfe did not reprimand him at the time. *Id.*

**J. Sick Leave, July-August 2016**

Following his July 27 meeting with DeWolfe, Montoya left work. Pl. Stmt., ECF No. 54-2 ¶ 85. Montoya states that he felt ill and "sought medical treatment at a hospital emergency room," and "e-mailed DeWolfe and told him about [his] medical condition and told him that [he] would be taking sick leave" for the rest of the day. Montoya Aff., ECF No. 54-1 at 14–15. Montoya remained on sick leave from July 27 through August 25, 2016. *Id.* at 11; Pl. Stmt., ECF No. 54-2 ¶ 90. He "provided a medical note stating he would be on sick leave through August 2." Pl. Stmt., ECF No. 54-2 ¶ 87. On August 2, he sent another doctor's note to an HR representative and asked her notify DeWolfe that he would be out of work until August 9. Pl. Ex. 44, ECF No. 54-1 at 317–18. At 9:57 am on August 3, DeWolfe emailed Montoya asking about his work status. Pl. Stmt., ECF No. 54-2 ¶ 88. At 10:25 am, DeWolfe emailed HR to notify them, "[w]ith concurrence from ASAC Kline and CDC [Chief Division Counsel] Domboski we have recorded [Montoya's] status as AWOL." Defs. Ex. 52, ECF No. 50-12 at 2. The AWOL designation was later reversed on September 20, 2016. Pl. Stmt., ECF No. 54-2 ¶ 97; Pl. Ex. 35, ECF No. 54-1 at 276. Montoya responded to DeWolfe at 10:52 am on August 3, stating that he would be out of work "at least until August 9." *Id.* ¶ 89; Defs. Ex. 51, ECF No. 50-11 at 3. An FBI Regional Nurse emailed DeWolfe at 2:16 pm on August 3, stating that Montoya "has been advised not to return to work until re-evaluated at his next appointment which is scheduled for August 9." Pl. Ex. 45, ECF No. 54-1 at 320. On August 9, Montoya "submitted an additional doctor's note to the regional nurse indicating he would not return to work until August 26, 2019." Pl. Stmt., ECF No. 54-2 ¶ 90.

### K. Documents Found in Vehicle and Inspection Report

On August 9, 2016, Kalish sent an email to ASAC O'Brien attaching documents and emails summarizing alleged misconduct by Montoya. Pl. Ex. 48, ECF No. 54-1 at 335. O'Brien testified that he requested this information because Kalish and DeWolfe "had brought to [his] attention potential policy violations" by Montoya "[s]ometime prior to" to August 9. O'Brien Dep., ECF No. 54-1 at 330.

Montoya avers that he received a call from another ET on August 15, 2016, reporting that "ASAC O'Brien, Kalish, and DeWolfe were searching the vehicle and searching [his] work space." Montoya Aff., ECF No. 54-1 at 11–12. DeWolfe asserts that he was moving the vehicle between two FBI facilities when he "noticed that there were numerous documents sitting in plain view in the vehicle," including "building permits, eviction notices, receipts for non-work related material." DeWolfe Aff., ECF No. 47-6 at 4. DeWolfe claims he notified Kalish, who notified O'Brien. *Id.*

On August 16, O'Brien sent an email to the FBI's Inspection Division "reporting the personal documents relating to an outside business that were found in Montoya's Bureau vehicle, as well as other information that had been reported by Kalish and DeWolfe." Pl. Stmt., ECF No. 54-2 ¶ 93; O'Brien Aff., ECF No. 48-3 at 4–5 ("The complaint [to the Inspection Division] outlined various allegations concerning Montoya's potential involvement in misconduct and compliance violations, related to unprofessional conduct, insubordination, misuse of government property, time and attendance fraud, misuse of an FBI vehicle, and security violations."). The Department of Justice OIG reviewed the allegations submitted on August 16, alongside a complaint Montoya submitted to them "[s]hortly after" August 16 alleging retaliation. Pl. Ex. 51, ECF No. 54-1 at 360. The OIG ultimately concluded that "the misconduct complaint was not

only without merit but was also an example of the excessive scrutiny to which the New Haven

Division subjected Montoya's conduct after he made protected disclosures." *Id.* at 362.[3]

### L. Letter of Requirement

On August 2, 2016, DeWolfe drafted a Letter of Requirement ("LOR") for Montoya,

which notified him of requirements for requesting and taking leave and created a 90-day

"opportunity period":

> You are being placed on a 90-day LOR, which begins with your receipt of this notice.
> During this opportunity period, you are to adhere to the requirements set forth within this
> letter. I will review your leave record in three months and at that time, will determine
> whether or not you have passed the LOR . . . . and whether or not any adverse action,
> including removal, will be proposed. Additionally, you are not eligible for reassignment,
> transfer, or promotion while on the LOR. . . .
>
> Failure to comply with the LOR requirements and the established leave policy, during the
> jeopardy period may result in a proposed adverse action, including removal from the FBI
> or federal service, without any further opportunity to improve attendance.
>
> A copy of this notice will be retained in your personnel folder. The LOR is not a
> disciplinary action and will not be placed in your official personnel file.

Pl. Ex. 54, ECF No. 54-1 at 384; DeWolfe Dep., ECF No. 54-1 at 144–46 (testifying that he

drafted the LOR from a template and then sought approval from the PAU [Performance

Appraisal Unit], Domboski, and Ferrick). Chief Division Counsel Jane Domboski, along with

Cynthia Westerbeke, signed the LOR on August 26. Pl. Ex. 54, ECF No. 54-1 at 385.

On August 26, Montoya returned to work following sick leave, and Domboski presented

him with the LOR in Westerbeke's presence. Pl. Stmt., ECF No. 54-2 ¶ 94. Montoya alleges that

he asked questions about the LOR but Domboski "could not or would not answer" them.

Montoya Aff., ECF No. 54-1 at 12. After receiving the LOR, Montoya met with Westerbeke in

---

[3] Although the Defendants argue that the OIG report is inadmissible hearsay, ECF No. 55 at 10,
the report would likely be admissible either as an admission by a party-opponent, Fed. R. Evid.
801(d)(2)(D), or as a public record, Fed. R. Evid. 803(8).

her office "until at least 10:30 a.m." Pl. Stmt., ECF No. 54-2 ¶ 95. At approximately 10:30 a.m.,

Kalish "advised Montoya to go back to work," but Montoya remained in Westerbeke's office. *Id.*

¶ 96; Montoya Aff., ECF No. 54-1 at 12. Montoya avers that he left Westerbeke's office at 11:00

a.m. and went to work at the ARMF (Automotive Radio Maintenance Facility), that he emailed

DeWolfe that day, and that he reported to O'Brien after lunch. Montoya Aff., ECF No. 54-1 at

12–13; Pl. Ex. 56, ECF No. 54-1 at 390 (coworker confirming, "I do recall that you were in the

shop the morning of the 26th"); Pl. Ex. 57, ECF No. 54-1 at 393–94 (emails Montoya sent on

August 26). On September 1, DeWolfe certified that Montoya was AWOL for 7.5 hours on

August 26; that designation was later reversed on September 20. Pl. Stmt., ECF No. 54-2 ¶ 97;

Pl. Ex. 58, ECF No. 54-1 at 396; Pl. Ex. 35, ECF No. 54-1 at 277.

In the evening of August 26, Montoya sent an email to FBI Director James Comey

regarding his "many concerns about the leadership in [the New Haven] division" and alleging

retaliation and "an extremely hostile environment." Defs. Ex. 68, ECF No. 51-8 at 2.

**M. Counseling Memoranda**

On August 29, DeWolfe provided Montoya with a memorandum outlining performance

requirements, including a daily work log submitted by 9:00 a.m. the following day. Pl. Ex. 59,

ECF No. 54-1 at 398. Montoya also alleges that DeWolfe told him on August 29 "that Ferrick

felt that I was in jeopardy of an unsatisfactory performance appraisal rating." Montoya Aff., ECF

No. 54-1 at 13. The next day, August 30, DeWolfe provided another memorandum indicating

that Montoya had "failed to submit [his] daily log on time and in the proper format." Pl. Ex. 61,

ECF No. 54-1 at 402. Montoya submitted a daily report at 9:36 a.m. Pl. Ex. 61, ECF No. 54-1 at

403. Montoya "called in sick" on August 31. Pl. Stmt., ECF No. 54-2 ¶ 100. On September 1,

DeWolfe provided Montoya with a memorandum indicating that Montoya had "failed to provide

a written update of [his] work accomplishment" by close-of-business, as instructed verbally and in writing. Pl. Ex. 62, ECF No. 54-1 at 407. On September 2, DeWolfe provided Montoya with a memorandum indicating that Montoya had "failed to submit [his] daily log on time and in the proper format." Pl. Ex. 64, ECF No. 54-1 at 413. Montoya submitted a daily report at 10:01 a.m. Pl. Ex. 63, ECF No. 54-1 at 409.

Montoya "went back out on sick leave" on September 2 and "never returned to work." Pl. Stmt., ECF No. 54-2 ¶ 101.

## II.   LEGAL STANDARD

The court must grant a motion for summary judgment if the moving party shows "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* In reviewing the record, the court "must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013).

## III.    DISCUSSION

Montoya's Amended Complaint asserts two counts: (1) retaliation because of protected activity, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*; and (2) hostile work environment in violation of Title VII, 42 U.S.C. § 2000e *et seq.* ECF No. 34 ¶¶ 93, 97. The Defendants move for summary judgment on both counts.

### A.  <u>Retaliation Because Of Protected Activity</u>

Title VII contains an antiretaliation provision making it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII]." 42 U.S.C. §2000e-3(a). "Title VII thus prohibits an employer from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011).

I assume familiarity with the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which applies to Title VII retaliation cases, *see Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010), and summarize it briefly here. To make out a prima facie case, the plaintiff must show that he (1) participated in a protected activity; (2) that the defendant knew of the protected activity; (3) that the he suffered an adverse employment action, and (4) that a causal connection exists between the protected activity and the adverse employment action. *Id.* at 164. If the plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the defendant does so, the plaintiff must show "that retaliation was a substantial reason

for the adverse employment action." *Id.* at 164. "A plaintiff can sustain this burden by proving

that a retaliatory motive played a part in the adverse employment actions even if it was not the

sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if

there were objectively valid grounds for the [adverse employment action]." *Id.* at 164–65

(internal quotation marks omitted; alterations in original). In 2013, the Supreme Court held that

"a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected

activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw.*

*Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

The bevy of factual disputes in this case and conflicting evidence of the Defendants'

motives do not warrant an extended discussion of each step of the *McDonnell Douglas*

framework to show why summary judgment would not be proper here. Montoya has adduced

sufficient evidence to raise genuine disputes of material fact regarding his retaliation claim,

particularly regarding the adverse actions taken against him after he initiated an EEO complaint

process in May 2016.[4] The Defendants do not dispute that filing an EEO complaint constitutes

protected activity, and the evidence shows that some of Montoya's supervisors knew of his

complaint by May 2016, and others knew by August 2016 at the latest. *See* Pl. Ex. 38, ECF No.

54-1 at 294 (DeWolfe and McWilliams met with EEO Counselor on May 31.); Ferrick Dep.,

ECF No. 54-1 at 161 (Ferrick became aware in "May or June of 2016."); Pl. Ex. 69, ECF No. 54-

---

[4] The Court notes that Montoya's argument that the Defendants did not promote him to GS-12 in
retaliation for protected conduct does not appear to be strong based on the evidence in the record,
for many of the reasons discussed in the Defendants' briefs. ECF Nos. 46, 55. However,
Montoya's amended complaint does not make a stand-alone claim related to the failure to
promote, so I need not assess the merits of such a claim. Indeed, it is likely that the same or
similar evidence will be admissible at trial regardless of whether the failure to promote, by itself,
constituted retaliatory conduct. As discussed below, Montoya has raised genuine disputes of
material fact regarding retaliation for filing his own EEO complaint, and so I deny summary
judgment as to his retaliation and hostile work environment claims.

1 at 428 (Kalish "became aware of Montoya's" EEO complaint in August 2016.); Pl. Ex. 49,

ECF No. 54-1 at 346 (O'Brien wrote in an email on August 16, 2016, "It should be noted ET

Montoya has threatened EEO complaints when confronted on performance issues, and has in fact

filed a recent EEO."); Kline Dep., ECF No. 54-1 at 267 (Kline, at some point, "learned that Mr.

Montoya had made a complaint of EEO discrimination," but could not recall when.).

As to the remaining elements of a retaliation claim—adverse employment actions and

but-for causation—Montoya has raised genuine disputes of material fact.

### 1. *Materially Adverse Employment Actions*

Title VII's antiretaliation provision covers employer actions that are "materially adverse

to a reasonable employee," which "means that the employer's actions must be harmful to the

point that they could well dissuade a reasonable worker from making or supporting a charge of

discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). "Alleged

acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may

take on greater significance when they are viewed as part of a larger course of conduct."

*Tepperwien*, 663 F.3d at 568.

While some of the actions Montoya points to would likely not be "materially adverse" on

their own, a reasonable juror could find that the actions, in the aggregate and construed in

Montoya's favor, could dissuade a reasonable worker from making a charge of discrimination.

Montoya has pointed to evidence showing that his employer took the following actions, among

others, after he initiated the EEO complaint process on May 19, 2016:

- On June 8, 2016, DeWolfe admonished Montoya for locking himself in at a facility and calling the police for assistance, telling him he was "an embarrassment to the FBI." Montoya Aff., ECF No. 54-1 at 9.

- On July 27, 2016, DeWolfe told Montoya that his work had been "minimally successful" in two areas since April 2016. Pl. Stmt., ECF No. 54-2 ¶ 77. Montoya

had received positive performance evaluations from 2012 to 2015. Pl. Exs. 4–7, ECF No. 54-1 at 27, 32, 38, 44.

- On July 27, DeWolfe also imposed restrictions on Montoya's use of sick leave and flex-time, telling him that the conditions did not apply to other ETs because Montoya "was the only one on the 'radar' right now." Montoya Aff., ECF No. 54-1 at 11.

- On August 3, 2016, DeWolfe recorded Montoya as "AWOL" even though Montoya had submitted a doctor's note to an HR representative on August 2 and asked her to notify DeWolfe that he would be out of work until August 9. Pl. Ex. 44, ECF No. 54-1 at 317–18; Defs. Ex. 52, ECF No. 50-12 at 2. The AWOL designation was not reversed until September 20, 2016. Pl. Stmt., ECF No. 54-2 ¶ 97; Pl. Ex. 35, ECF No. 54-1 at 276.

- On August 15, 2016, Montoya received a call from a fellow ET reporting that O'Brien, Kalish, and DeWolfe were searching his FBI vehicle and work space, in view of other employees. Montoya Aff., ECF No. 54-1 at 11–12.

- On August 16, 2016, O'Brien submitted a complaint to the FBI Inspection Division, alleging that Montoya had been potentially involved in "misconduct and compliance violations, related to unprofessional conduct, insubordination, misuse of government property, time and attendance fraud, misuse of an FBI vehicle, and security violations." O'Brien Aff., ECF No. 48-3 at 4–5.

- On August 26, 2016, Domboski presented Montoya with a Letter of Requirement imposing strict requirements regarding the use of leave time and warning that "[f]ailure to comply with the LOR requirements and the established leave policy, during the jeopardy period may result in a proposed adverse action, including removal from the FBI or federal service, without any further opportunity to improve attendance." Pl. Ex. 54, ECF No. 54-1 at 384; Pl. Stmt., ECF No. 54-2 ¶ 94. The LOR also warns that "AWOL may be grounds for removal from the FBI and from federal service." Pl. Ex. 54, ECF No. 54-1 at 382.

- On September 1, 2016, DeWolfe certified that Montoya had been "AWOL" for 7.5 hours on August 26, even though Montoya emailed DeWolfe and spoke with O'Brien that day. Pl. Ex. 57, ECF No. 54-1 at 393–94; Montoya Aff., ECF No. 54-1 at 12–13; Pl. Stmt., ECF No. 54-2 ¶ 97. That designation was not reversed until September 20, 2016. Pl. Stmt., ECF No. 54-2 ¶ 97; Pl. Ex. 35, ECF No. 54-1 at 277.

- On August 29, 2016, DeWolfe told Montoya "that Ferrick felt that [Montoya] was in jeopardy of an unsatisfactory performance appraisal rating." Montoya Aff., ECF No. 54-1 at 13. As noted, Montoya had received positive evaluations from 2012 to 2015.

- On August 30, 2016, DeWolfe chastised Montoya for submitting his required daily work log 36 minutes late. Pl. Ex. 61, ECF No. 54-1 at 402–03. On September 2, DeWolfe again chastised Montoya for submitting his required daily work log 61 minutes late. Pl. Ex. 63, ECF No. 54-1 at 409; Pl. Ex. 64, ECF No. 54-1 at 413.

Taken together, and construing the facts in Montoya's favor, these actions could dissuade a reasonable worker from filing or pursuing an EEO complaint because Montoya's supervisors embarrassed him in front of his coworkers, told him he was on the "radar," falsely marked him as AWOL (which, they warned, was grounds for removal), filed a meritless complaint against him with the Inspection Division, gave him negative performance reviews in a sharp departure from previous practice, singled him out for excessive scrutiny, and threatened to terminate him if he did not comply with very strict requirements.

Cindy Westerbeke was sufficiently concerned by the actions she witnessed that she emailed Ferrick on August 30, 2016 to report potential unlawful retaliation. Pl. Ex. 70, ECF No. 54-1 at 436–47 (listing adverse actions against Montoya in July and August 2016, noting that "use of unscheduled leave is a common practice in New Haven," and stating that the "actions appear to be made in retaliation to the EEO complaint."). In evaluating the complaint made to the Inspection Division, the Department of Justice OIG concluded that "the misconduct complaint was not only without merit but was also an example of the excessive scrutiny to which the New Haven Division subjected Montoya's conduct after he made protected disclosures." Pl. Ex. 51, ECF No. 54-1 at 362. The report also noted that "Montoya appeared to have been singled out in some instances for doing what his colleagues and supervisors did." *Id.* at 368. The fact that both Westerbeke and the OIG interpreted the actions against Montoya to constitute "excessive

scrutiny" and "singl[ing] out" suggest that a reasonable juror could find these actions, taken together, to be materially adverse.[5]

The Defendants point to cases suggesting that actions such as requiring a doctor's note for any sick leave or threatening future disciplinary actions[6] are not adverse employment actions under Title VII. Defs. Mem., ECF No. 46 at 33–34. But the facts of these cases distinguish them from this one. In *Cody v. County of Nassau*, the plaintiff was issued counseling notices after she neglected specific job duties, and was required to provide a doctor's note after being absent thirteen out of fifteen days while training for a new position and "fail[ing] to complete a single shift" during that month. 577 F. Supp. 2d 623, 633–34 (E.D.N.Y. 2008), *aff'd*, 345 F. App'x 717 (2d Cir. 2009). There also was no evidence that the plaintiff was singled out or treated more harshly than other coworkers. *Id.* In *Tepperwien*, the plaintiff did not allege on appeal that the

---

[5] The Defendants suggest that the OIG report should not be considered "evidence that the [OPR] referral was retaliatory for Montoya's EEO complaint" because "[t]he allegation that Montoya was retaliated against for having filed an EEO complaint was not before the OIG, and was not investigated by the OIG." Reply, ECF No. 55 at 10; *see also id.* at 2 n.1 (noting that Montoya's "separate whistleblower proceeding" alleges that his supervisors retaliated against him for making protected disclosures in his July 2015 email). While the OIG may have focused on Montoya's allegation of whistleblower reprisal, a reasonable juror could find on this record that the adverse actions discussed in the OIG report were not traceable solely to the July 2015 email, but also stemmed from Montoya's EEO activities. Therefore, the OIG report is indeed relevant evidence for Montoya's allegations of retaliation under Title VII in this case.

[6] The Defendants cite *Nix v. Cino* for the proposition that "[m]ere reprimands or threats of disciplinary action, absent any other negative results, such as a decrease in pay, do not qualify as adverse employment actions." No. 02CV4609 (DLI)(VVP), 2006 WL 2711625, at *5 (E.D.N.Y. Sept. 21, 2006). Though *Nix* was issued a few months after the Supreme Court decided *Burlington Northern*, the *Nix* court did not apply the *Burlington* standard and instead applied an old definition of adverse employment action as a "materially adverse change in working conditions." *Id.*; *see Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43–44 (2d Cir. 2019) ("Prior decisions of this Circuit that limit unlawful retaliation to actions that affect the terms and conditions of employment . . . no longer represent the state of the law. Instead, the proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination.") (internal citations and quotation marks omitted).

inquiry into his use of sick leave was retaliatory; the Second Circuit affirmed that the plaintiff's *other* alleged actions were not materially adverse. 663 F.3d at 569 n.7. In *Blake v. Potter*, the court noted that "being asked to bring in a doctor's note . . . in compliance with [company] policy . . . or being given a single letter of warning for failure to do so . . . would not dissuade a reasonable employee in Plaintiff's position from complaining about discrimination." No. 03 CIV. 7733(LAP), 2007 WL 2815637, at *9 (S.D.N.Y. Sept. 25, 2007), *aff'd*, 330 F. App'x 232 (2d Cir. 2009). The requirements imposed on Montoya, by contrast, were not in line with previous company policy and went well beyond a dispute about a few absences or a doctor's note. None of these cases, therefore, suggests that the actions taken against Montoya, in the aggregate, could not be materially adverse.

### 2. *Causation*

A reasonable juror could also find, construing the evidence in Montoya's favor, that Montoya's EEO complaint was a but-for cause of the adverse actions. "Requiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 n.5 (2d Cir. 2013) (noting that "a plaintiff's injury can have multiple 'but-for' causes"). And as Montoya notes, "proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

While the Defendants have certainly presented evidence of some legitimate, nonretaliatory reasons for the actions taken against Montoya, Montoya has also presented

evidence sufficient to create a genuine dispute as to whether retaliatory animus was a but-for cause for these actions. First, the adverse actions highlighted above followed closely on the heels of Montoya's May 2016 EEO complaint. DeWolfe knew of Montoya's complaint by May 31, and he started harshly critiquing Montoya's performance in June and July. O'Brien knew of the EEO complaint by August 16 at the latest, the same day he submitted a complaint to the Inspection Division that was found to be meritless. Kalish knew of the EEO complaint by August 2016, and he and DeWolfe supplied information for O'Brien's complaint. This temporal proximity provides indirect evidence that Montoya's EEO complaint was a but-for cause of the adverse actions.

Second, the negative performance feedback Montoya started receiving in June 2016 was a sharp departure from Montoya's prior performance reviews, and he was repeatedly chastised for what a reasonable juror could find were minor infractions that were overlooked when committed by others. As recently as April 26, 2016, DeWolfe recommended Montoya for promotion, stated that Montoya was "regularly performing at the GS12 level," that "[h]is demeanor and personality are positive along with his work ethics," and that he "remains a positive influence within the field office and the FBI in general." Defs. Ex. 30, ECF No. 49-10 at 2, 10. By July 27, 2016, DeWolfe told Montoya his work had been "minimally successful." Pl. Stmt., ECF No. 54-2 ¶ 77. At that meeting, DeWolfe cited concerns such as (1) Montoya's accidentally locking himself in at a work site; (2) Montoya's requesting help from a lower-grade ET; (3) Montoya's exceeding an approved spending amount; (4) Montoya's use of leave time; (5) Montoya's stopping on I-95 during a work day; and (6) Montoya's comment about the implementation of the Sharepoint site. The OIG ultimately did not substantiate these allegations of misconduct and found that Montoya was being "singled out" for a number of alleged

infractions. *See* Pl. Ex. 51, ECF No. 54-1 at 362 (finding that DeWolfe "assented via email to Montoya charging $432 to his government card); *id.* at 363 ("Montoya was not unique in taking last-minute leave . . . [T]he Division had a flexible leave policy . . . [and] all ETs, and even supervisors, were allowed to occasionally take leave with little notice."); *id.* ("Montoya's presence on I-95 appears to be related to his ET work duties."); *id.* at 366 ("several of the New Haven Division ETs told us that they did not regularly use SharePoint. . . . Still, none of these individuals were charged with misconduct."); *id.* at 367–68 ("Both [DeWolfe] and [Kalish] . . . agreed that the [911] call was not misconduct. We concluded that Montoya's call to 911 was not misconduct."); *id.* at 368 (concluding that "Montoya appeared to have been singled out in some instances for doing what his colleagues and supervisors did"). The OIG's findings, along with the sharp departure from Montoya's previous performance reviews, suggest that DeWolfe's criticisms in July 2016 were pretextual. *See Gordon*, 232 F.3d at 117 (noting that "disparate treatment of fellow employees who engaged in similar conduct" is indirect proof of causation).

The Letter of Requirement and counseling memoranda in late August 2016 similarly seemed to chastise Montoya for immaterial infractions—such as submitting a daily work log 36 minutes late—and to subject Montoya to disparate treatment from his fellow employees. Westerbeke reported to Ferrick that "use of unscheduled leave is a common practice in New Haven," and that she was concerned that the LOR "for use of unscheduled leave" was "made in retaliation to the EEO complaint." Pl. Ex. 70, ECF No. 54-1 at 437.

Finally, Montoya has pointed to some evidence of retaliatory animus. In his May 31, 2016 interview with the EEO Counselor, DeWolfe stated "that he is disappointed that Mr. Montoya chose to file an EEO complaint." Pl. Ex. 38, ECF No. 54-1 at 295. In an August 16, 2016 email summarizing Montoya's alleged "issues of insubordination" and other misconduct,

O'Brien included the fact that Montoya "threatened SAC Ferrick with an EEO complaint if she did not intervene" regarding his promotion. Pl. Ex. 49, ECF No. 54-1 at 348. While discipline for insubordination could, of course, be legitimate and nonretaliatory, in this case, the evidence at least raises a genuine dispute about whether the discipline would have occurred if not for the EEO complaint.

This evidence of animus, pretext, disparate treatment, and excessive scrutiny, taken together and construed in Montoya's favor, raises a genuine dispute as to whether his filing an EEO complaint was a but-for cause of the adverse actions taken against him. Because Montoya has raised genuine disputes of fact with respect to his retaliation claim, summary judgment is denied as to that claim.

### B. **Hostile Work Environment**

Montoya's amended complaint also alleges that the "actions of defendants which subjected plaintiff to a pattern of harassment in the work place which was pervasive created a hostile work environment in violation of Title VII . . . 42 U.S.C. § 2000e, *et seq.*" ECF No. 34 ¶ 97. An employer violates Title VII when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) . The incidents must be "sufficiently continuous and concerted in order to be deemed pervasive." *Id.* And courts must "consider the totality of the circumstances, including the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted).

The Defendants argue that Montoya alleges only "trivial harm" and at most alleges "he was unfairly criticized and disciplined for his use of leave, and his performance was hyper-scrutinized." Defs. Mem., ECF No. 46 at 39. This understates Montoya's allegations. In addition to alleging excessive scrutiny and unfair criticism for his use of leave, Montoya also points to evidence of the following hostile acts:

- Kline became very angry in an EEO-related meeting regarding Suizdak in early 2015. Pl. Stmt., ECF No. 54-2 ¶ 8; Montoya Dep., ECF No. 54-1 at 64–65.

- Kline "shouted at [him], accusing [him] of being disrespectful" at a meeting in May 2016. Montoya Aff., ECF No. 54-1 at 7.

- DeWolfe told Montoya he was "an embarrassment to the FBI," that he was told he was the only one on the "radar" in July 2016. Montoya Aff., ECF No. 54-1 at 9.

- DeWolfe falsely marked Montoya AWOL on two occasions in August 2016. Pl. Ex. 44, ECF No. 54-1 at 317–18; Defs. Ex. 52, ECF No. 50-12 at 2; Pl. Ex. 57, ECF No. 54-1 at 393–94; Montoya Aff., ECF No. 54-1 at 12–13.

- Montoya's supervisors searched his vehicle in view of his coworkers. Montoya Aff., ECF No. 54-1 at 11–12.

- O'Brien filed a complaint about Montoya with the FBI Inspection Division. O'Brien Aff., ECF No. 48-3 at 4–5.

Montoya has thus shown more hostile conduct than the plaintiff did in *Nugent v. St. Lukes-Roosevelt Hospital Center*, contrary to Defendants' claim. 303 F. App'x 943 (2d Cir. 2008) (summary order affirming summary judgment for defendants when plaintiff cited only derogatory language, dismissive comments, attempts to create a paper trial, and intense scrutiny). The alleged conduct in this case occurred between early 2015 and September 2016 and was

particularly frequent after Montoya filed his EEO complaint in May 2016. Viewing this evidence in the light most favorable to Montoya, a reasonable juror could find that this conduct was frequent, severe, pervasive, humiliating, and interfering, such that it created a hostile environment for Montoya. Montoya himself certainly perceived the environment as abusive, taking medical leave and visiting the emergency room for work-induced stress. Therefore, I deny the motion for summary judgment on this claim as well.

## IV.   CONCLUSION

For all the foregoing reasons, the Defendants' motion for summary judgment, ECF No. 45, is DENIED. The parties shall file a joint trial memorandum by May 3, 2020, as previously ordered by the Court. *See* ECF No. 56.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: February 26, 2020
        Hartford, Connecticut